STATE OF NEBRASKA, APPELLEE, V. DENNIS C. TIMMERMAN, APPELLANT.
480 N.W.2d 411

Filed February 28, 1992.    No. S-90-460.

Dennis R. Keefe, Lancaster County Public Defender, and Richard L. Goos for appellant.

Don Stenberg, Attorney General, Mark D. Starr, and, on brief, Susan M. Ugai for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

In this case defendant Dennis C. Timmerman, age 34, was charged, by amended information, with four counts of burglary and one count of possession of burglar's tools, as follows: count I: burglary on August 3, 1989, at the office of

Commercial Investment Properties at 225 North Cotner Boulevard, Suite 105, Lincoln, Lancaster County, Nebraska; count II: burglary on August 3, 1989, at the Robert Chapin, Jr., Law Office, 5625 O Street, Suite 2B, Lincoln; count III: burglary on August 10, 1989, at the offices of Security Mutual Life Insurance Company, 303 North 52d Street, Nos. 200 and 201, Lincoln; count IV: burglary on August 10, 1989, at the office of Integrated Resources, 303 North 52d Street, No. 301, Lincoln; and count V: possession of burglar's tools on August 10, 1989, in Lincoln.

After trial, a jury convicted defendant on each count. Defendant was sentenced to 18 months' to 3 years' imprisonment on each burglary conviction, "to be served consecutively to each other and consecutively to any other sentence already pronounced," and to 1 to 2 years on the conviction for possession of burglar's tools, to be served concurrently with the sentence on the fourth burglary count.

Defendant timely appealed. In this court, defendant assigns four errors, which may be consolidated into two: (1) that the trial court erred in admitting unsubstantiated evidence of other crimes and (2) that the trial court erred in admitting into evidence a letter addressed to defendant and handed to police by defendant's mother at the residence of defendant and his mother. We hold that the trial court erred in both respects, but affirm because of other overwhelming admissible evidence of defendant's guilt.

In reviewing a criminal conviction, the Supreme Court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and the verdict will be affirmed, in the absence of prejudicial error, if properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. See *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990). Viewed in that light, the record shows the following:

## I.

With regard to counts I and II, the burglaries of August 3, the evidence shows that sometime between 11:30 p.m. on August 2 and the morning of August 3, the law office of Robert

Chapin at 5625 O Street, Suite 2B, Lincoln, was burglarized. Chapin left his office about 11:30 p.m. on the 2d. When he returned the next day, Chapin found that the doors to both the reception area and the inner office had been forced open, apparently with a screwdriver or pry bar. An Emerson stereo radio-cassette player, sometimes called a boom box, was missing from the office. The owner positively identified the boom box seized on August 4 from the defendant's home as the stolen box. When seized by police from defendant, the box still contained the tapes that were in it when the owner left it.

On the same night, about one block away, the office of Commercial Investment Properties (CIP) at 225 North Cotner Boulevard, Suite 105, was also burglarized. The burglar had kicked in the inside glass door to gain entry. There were some pry marks on the door about a quarter inch wide, consistent with marks which would be made by the screwdrivers later taken from the defendant. Some keys to businesses which had been listed for sale by CIP or were managed by CIP were taken from a desk. Address tags were attached to the keys. A CIP employee positively identified keys later taken from the defendant's home as the keys stolen from the CIP office.

On August 4, 1989, an officer of the Lincoln Police Department investigated a call received by the police department. The caller, later determined to be defendant's mother, stated that stolen goods, particularly watches and keys, might be found at 600 South 56th Street, the residence of defendant and his mother. The officer told the defendant that he was at the residence to look for stolen goods. Both defendant and his mother consented to a search of the house. Defendant accompanied the officer during the search.

The officer found a brown vinyl bag containing three screwdrivers and sets of keys with tags with the names of various businesses on them. Defendant voluntarily told the officer he had worked for "Topper Cleaning Company" and had the keys because the locks to those businesses had been changed. After defendant volunteered to give the keys to the officer, the officer took them.

An employee of CIP testified that CIP did not contract with any cleaning companies to clean premises listed or managed by

CIP and that the defendant had never worked for CIP. The officer investigated and was unable to locate a Topper Cleaning Company in Lincoln.

The officer also saw in the defendant's room the Emerson boom box that had been reported stolen in the Chapin burglary. Later that day, August 4, a search warrant for defendant's residence was issued and served. During the search, the officers took into custody the brown vinyl bag containing screwdrivers and a paper with addresses written on it, one of which was the address of the Chapin law office. The officers also seized the Emerson boom box.

On August 6, 1989, the officer who had executed the search warrant interviewed defendant in his home about property seized on August 4 pursuant to the search warrant. Defendant was not under arrest at this time. The officer asked defendant about the Emerson boom box which was reported stolen from the Chapin law office. Defendant said that he had purchased the boom box from someone at a tavern.

The officer told defendant that the keys which had earlier been taken into custody had been reported stolen in a burglary. Defendant insisted that the keys had been in his possession for several months and that they could not have been taken in a burglary.

The officer also asked defendant about a list of addresses that had been in the zippered brown bag. The defendant stated that they were addresses of attorneys. Included on the list was the address of the Chapin law office, from which the boom box was stolen.

## II.

With regard to the August 10 burglaries, the record shows that in the very early hours of August 10, 1989, the office of Integrated Resources at 303 North 52d Street, No. 301, was burglarized. The office door and some desk drawers had been pried open, and a coin collection and some petty cash were missing.

At about the same time, the offices of Security Mutual at 303 North 52d Street, Nos. 200 and 201, were also burglarized. The office doors had been pried open, and a VCR was missing, as

well as the remote control and cable, a roll of stamps, and some petty cash. A secretary at Security Mutual was able to identify a roll of stamps taken from a black bag found with defendant when he was arrested as the stamps stolen from Security Mutual, because she had written on a slip of paper that was tucked inside the roll. The secretary also identified the remote control that the police took from the defendant at the same time as that missing from the office. The police did not recover the VCR from defendant, but later on the morning of August 10, another employee of Security Mutual found it and another VCR, which had been stolen from another business in the building, in a creekbed behind the building.

On August 8, a police broadcast had been initiated for defendant to be picked up. Defendant's mother spoke with a police officer on August 9, 1989, at about 11:10 p.m. After this conversation, the officer broadcast a description of defendant and his companion, Royce Hilbers, both of whom were on bicycles. Defendant was described as wearing white shorts with a black T-shirt and Hilbers was wearing blue denim shorts and a green shirt.

Hilbers had been involved in the two August 10 burglaries, and the State had agreed to prosecute him for only one Class IV felony if Hilbers testified for the State and satisfied other conditions.

Hilbers testified for the State at the defendant's trial as part of the plea bargain. Hilbers testified that he was acquainted with defendant when both were incarcerated in the Lancaster County Jail early in 1989. On August 9, Hilbers met the defendant early in the evening, and the two ate and talked at the house of a friend of Hilbers' until about 10 or 10:30 p.m.

Hilbers testified that he and defendant then rode their bicycles to the defendant's mother's house, where the defendant packed a black bag with tools, including screwdrivers and a hammer; knit gloves; and a flashlight. About 11 or 11:30 p.m. the two left the house on bicycles. Defendant took the black bag with his equipment and a crowbar, which he held across the handlebars of his bicycle. After going down alleys and back streets, the two arrived at 303 North 52d Street. Defendant looked around for a point of entry and entered through an

underground garage door to the building. Defendant put the gloves on and took the black bag of tools and the crowbar with him into the building. Hilbers was to watch for police and ride or walk through the parking lot and wave if he spotted anyone. Defendant was in the building for over an hour, and when he came out, he was wearing the gloves and carrying two VCR's, as well as his various tools. Hilbers testified he met defendant in the basement at the door defendant had entered. Hilbers held the VCR's while defendant closed the door. They hid the VCR's in a creekbed behind the building. Hilbers put a cable from one VCR in his pocket.

Defendant and Hilbers rode their bicycles to Cotner Boulevard and Vine Street and then hid in bushes on the west side of Cotner. The two waited to see if they were being followed. Hilbers left the bushes and walked down the street, where he almost immediately saw a police cruiser. The cruiser officer picked him up at Cotner and Vine, at approximately 1 a.m. on August 10, as a person meeting the description of one of the two men described in the police broadcast. The police arrested Hilbers and found in his pocket the VCR cable taken from Security Mutual.

The police searched the area and found defendant nearby, hiding in the bushes. Defendant was dressed as the other person described in the police broadcast. Next to defendant were two bicycles. The reflectors of both of them had been covered by the knit gloves. A black bag was on the ground, and a crowbar was hanging from one of the trees. The black bag contained a small hammer, wire, several screwdrivers, a small amount of cash, the commemorative coins taken from Integrated Resources, a flashlight, and the stamps and remote control taken from Security Mutual.

Defendant did not testify at the trial and in this appeal does not challenge the facts as set out above, nor does he contend that such evidence is not sufficient to support his five convictions. Nor indeed could he successfully so contend.

## III.

Defendant's allegations of error are concerned with other evidence adduced by the State, apparently in an

overenthusiastic effort to bolster its already strong case against defendant and, in effect, to swat a fly with a sledge hammer, shoot a mouse with an elephant gun, or mash an ant with a diamond-studded baseball bat. In connection with the challenged evidence, the record shows as follows:

Defendant's companion Hilbers testified that he met defendant in the evening of August 9, ate with him, and bicycled with him to the scene of the two August 10 burglaries as described above. There apparently was much conversation between the two, particularly at the time they were eating.

Before Hilbers testified before the jury as to the conversations between him and defendant, a hearing was held outside the presence of the jury as to those conversations, pursuant to Neb. Evid. R. 104(1), Neb. Rev. Stat. § 27-104(1) (Reissue 1989). See State v. Messersmith, 238 Neb. 924, 473 N.W.2d 83 (1991). At the conclusion of this hearing, defendant's counsel objected to the conversation, as follows:

I do object to Mr. Hilbers relating these conversations with my client before the jury on the grounds that they are irrelevant and immaterial. They are unreliable. They are very vague. There's nothing that is definite or certain as to place or time about these. The prejudice will outweigh the probative value if admitted into evidence. I would assert a denial of my client's right to have a fair trial and due process of law in accordance with the due process clause. I think, too, Your Honor, that if this evidence is admitted, I think it opens a collateral matter, if I might say that. I think it goes into collateral matters that I'm going to have to do investigation on and try to establish the truth or falsity of those things and that's going to be difficult because of the vagueness, but I object for all of those reasons.

Counsel for the State responded that the testimony

goes directly to the motive and intent of Mr. Timmerman and his activity of August 10, 1989 and also of August 3rd of 1989. If the information that he gave Mr. Hilbers is vague, it's because Mr. Timmerman was vague, but it is sufficient enough to allow us to see that he was committing burglaries and did have a common scheme or

plan.

The court overruled defendant's objections and permitted all questions concerning the conversations of August 9, but not concerning conversations during the time Hilbers and defendant were incarcerated in April, May, or June 1989.

Hilbers then testified before the jury that during their conversation, defendant discussed his criminal activities during the time defendant was released on bond from the county jail up to August 9. Part of the conversation was as follows:

Q. And that night you talked was August 9th of 1989?

A. Yes, it was.

Q. What did Mr. Timmerman tell you about the criminal activity he was involved in during that two-week time period?

A. He just told me that he had been into a lot of different business buildings and he had been into a lot of pharmacies and anything that he could get in and out was his.

Q. When you say he had been into, what did that mean?

A. Burglarized.

Q. Did he tell you anything about the number of such activities he had been engaged in?

A. He bragged like there were 60 or 70 different places he had burglarized in the last two or three weeks.

Q. Did he indicate to you any amount of money that he had obtained from those burglaries?

A. Yes.

Q. And what amount did he indicate to you he had obtained?

A. He thought 8 or $9,000, if not more.

Q. And do you recall any specific items that he had told you that he had obtained as a result of any of these burglaries.

A. Yeah, there was a gold watch, a gold woman's watch. I guess it was supposed to be pretty expensive. It turned out to be inexpensive.

. . . .

Q. Did Mr. Timmerman tell you about any other incidents that he had been engaged in, burglaries, during

that two-week period?

A. Yeah. He said he had been into a place on 56th Street. He named no business, no name of any person. That he thought it was a business building and when he had opened the door, finally got the door open, he saw a dog or cat or something inside the door and after he had been in there awhile, he noticed he had caught a woman asleep in an apartment.

Q. Did that conversation take place that night or some other time?

A. That conversation took place a couple days after we were locked up in jail. [This specific evidence, of course, violated the court's announced ruling.]

Q. Going back to the night of August 9th of 1989, do you recall any other burglaries that he told you about?

A. Yeah, he told me about Rolf Shasteen.

Q. And what did he tell you about that?

[Answer stricken because the alleged Shasteen burglary had not been discussed in the hearing outside the presence of the jury. The following question was then asked about the Shasteen burglary:]

Q. . . . . Do you recall if Mr. Timmerman told you what he had obtained from the burglary?

A. Yes, two pistols and $500 in cash.

Hilbers testified that he believed about 50 to 75 percent of the defendant's story.

On August 9, 1989, at about 11:10 p.m., the defendant's mother spoke with a police officer at defendant's residence. As stated above, the officer was given information by defendant's mother; in addition, the mother also gave the officer a letter addressed to the defendant. The return address gave the name "Faulkerson" and the address of the city-county jail. It was postmarked August 3. The court sustained the defendant's hearsay objection when the officer testified that the mother told him she had found the letter in the defendant's bathroom.

The first page in the envelope was a letter signed "J." The author stated he sensed "a potential for serious $." The second page contained a list of addresses, broken down into five different areas. Included within the listed areas were the Chapin

law office, Security Mutual, and Integrated Resources—the locations of three of the charged burglaries. At the bottom of the list is the notation "Theres no sense lookin where the $ aint an this is where it is!"

The letter was admitted into evidence. The defendant specifically objected to the admission at the time on grounds of hearsay, lack of foundation, irrelevancy, prejudice, and a violation of the right to confront.

The State contends in its brief that "the admission or exclusion of evidence is a matter left largely to the sound discretion of the trial court . . . ." Brief for appellee at 7. We have previously held that is an inaccurate statement of the law. See *State v. Messersmith*, 238 Neb. 924, 936, 473 N.W.2d 83, 92 (1991), wherein we said:

[I]n all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence . . . . Although the word "discretion," in one form or another, does not appear in either Rule 401 or Rule 403, nevertheless, judicial discretion, as a factor in admissibility, is implicit in Rule 401, concerning the admission of relevant evidence, and Rule 403, regarding exclusion of relevant evidence. Consequently, one might correctly conclude that we expressly disapprove of the all-inclusive and categorically unrestricted evidential proposition "The admission or exclusion of evidence is a matter within the discretion of the trial court," notwithstanding this court's previous use of that expression.

"In proceedings where the statutes embodying the rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility." *State v. Schwartz*, 239 Neb. 84, 95, 474 N.W.2d 461, 468 (1991).

Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1989), provides, in part, "Evidence which is not relevant is not admissible." Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2)

(Reissue 1989), the "evidence of other crimes" statute, is a rule of relevance. See *State v. Coca*, 216 Neb. 76, 341 N.W.2d 606 (1983). Rule 404(2) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The list of exceptions in rule 404(2) is illustrative only, not exclusive. It is an inclusionary rule that permits the use of uncharged misconduct evidence if the evidence is relevant for any purpose other than to show the defendant's propensity or disposition to commit the crime charged. *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990).

In connection with the conversations and the admissibility of those conversations as they relate to evidence of other crimes, the provisions of rule 404 control. It must be noted, however, that in this case we do not reach a full-blown decision on the issue whether the evidence in question, while probative, is not admissible because "its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1989).

In *Huddleston v. United States*, 485 U.S. 681, 691-92, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), the U.S. Supreme Court set out the requirements for a trial court's preliminary finding as to the probative prejudicial issue:

> We share petitioner's concern that unduly prejudicial evidence might be introduced under Rule 404(b). . . . We think, however, that the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; *second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b)*; third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair

prejudice . . . and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

(Emphasis supplied.)

The concern in this case ends with the determination as to the relevancy requirements, and we need go no further into the weighing process.

In *Huddleston v. United States*, 485 U.S. at 689, the Court discussed the relevance of similar testimony when it said:

We conclude that a preliminary finding by the court that the Government has proved the act by a preponderance of the evidence is not called for under Rule 104(a). This is not to say, however, that the Government may parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo. Evidence is admissible under Rule 404(b) only if it is relevant. . . . In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor. . . . In the instant case, the evidence that petitioner was selling the televisions was relevant under the Government's theory only if the jury could reasonably find that the televisions were stolen.

The application of that test to the facts in the case before us leads to the conclusion that the proffered "similar acts" are not relevant to the four specific burglaries in this case. The relevancy of the "60 or 70" burglaries depends on whether the burglaries actually occurred and whether the defendant committed them. In this case, the State attempted to prove particular burglaries by evidence of defendant's overall character as a burglar. That is not allowed by rule 404.

We do not even have allegations of specific burglaries. The only evidence we have of any uncharged burglaries is Hilbers' statements that the defendant told him about them. Hilbers has no direct knowledge that the burglaries occurred, and he even testified that he did not believe that they all occurred. If the

uncharged burglaries had been charged as crimes against defendant, the evidence as to the committing of such burglaries would be insufficient to warrant submission to the jury. Under rule 404(2), evidence of other crimes is not admissible unless there is sufficient evidence that the crimes were actually committed and that the defendant committed them, to warrant submission to a jury if the other crimes had been charged. If there is insufficient evidence to permit the jury to find that those conditions are fulfilled, *Huddleston* tells us the other similar acts are not relevant.

Professor Imwinkelried states:

> Rule 104(b) procedures govern proof of the defendant's identity as the actor. . . . [T]he judge admits the evidence [of uncharged misconduct] so long as the proponent's proof supports a rational jury finding (a permissive inference) of the defendant's identity. If the plaintiff or prosecutor presents substantial evidence or makes out a prima facie case of the defendant's involvement, the judge admits the evidence. The defense submits any controverting evidence directly to the jury; and on request, the judge instructs the jury that they must finally decide the question of the defendant's identity.

Edward J. Imwinkelried, Uncharged Misconduct Evidence § 2:08 at 21 (1984).

In the case before us, we have nothing other than Hilbers' statements, made as a result of a plea bargain, that the defendant had said he had committed 60 or 70 burglaries. Hilbers himself admitted that he did not believe much of the defendant's statements. The statements give no details as to time, place, circumstances, or method of operation. We have said that "evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question." *State v. Kern*, 224 Neb. 177, 185, 397 N.W.2d 23, 29 (1986). In this case, there are no details about the circumstances that could make these prior crimes relevant, for example, whether the defendant used burglar's tools similar to those he is charged with possessing in the commission of the

prior offenses. The statements of the witness referring to uncharged misconduct were inadmissible and were improperly admitted into evidence.

The letter given to the police by the defendant's mother was also inadmissible. In order to be admitted into evidence, documents must be identified or authenticated. See Neb. Evid. R. 901(1), Neb. Rev. Stat. § 27-901(1) (Reissue 1989). Such authentication may be provided by testimony. See rule 901(2)(a). However, Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 1989), requires that a witness may not testify to something of which the witness has no personal knowledge. The officer on whose testimony the letter was admitted could testify only that the defendant's mother gave him the letter. Such testimony does not authenticate the letter. We still do not know who wrote the letter, where the mother found the letter, whether the defendant had read the letter, or whether the defendant had ever been in possession of the letter. Without knowledge of at least some of these facts, we cannot even begin to determine whether the letter was possibly relevant.

An erroneous admission of evidence is not prejudicial if it is harmless beyond a reasonable doubt. *State v. Oliva*, 228 Neb. 185, 422 N.W.2d 53 (1988). "[I]mproper admission of evidence constitutes harmless error where the evidence is cumulative and there is other competent evidence to support the conviction." *State v. Rowland*, 234 Neb. 846, 853, 452 N.W.2d 758, 763 (1990); *State v. Chapman*, 234 Neb. 369, 451 N.W.2d 263 (1990).

"Since there was, however, other overwhelming evidence to conclusively establish the defendant's guilt, the error was harmless beyond a reasonable doubt." *State v. Sullivan*, 236 Neb. 344, 349, 461 N.W.2d 84, 87 (1990). In the case before us, the evidence of the defendant's guilt was overwhelming. Defendant was found hiding in the bushes at 1 a.m., with the stolen goods and the burglar's tools, near the location of the August 10 burglaries. Defendant's companion testified to the actual commission of the two August 10 burglaries. Other stolen goods, positively identified as stolen, were recovered from the defendant's home.

It is with reluctance that we affirm the judgment herein,

because the offending evidence was so unnecessary and so damning. In the light of the improper testimony, there was some danger of defendant's being convicted of being a burglar, and not of committing the four burglaries in this case. In *United States v. Hasting*, 461 U.S. 499, 509, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983), however, the U.S. Supreme Court reversed a judgment of a court of appeals (which had reversed a judgment of conviction) and stated, "Since *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)], the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." See, also, *Rose v. Clark*, 478 U.S. 570, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); *Arizona v. Fulminante*, ____ U.S. ____, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

Under our view of Nebraska law, the errors herein are harmless because of the overwhelming evidence of guilt, and the judgment must be affirmed.

AFFIRMED.

WHITE and FAHRNBRUCH, JJ., concur in the result.