STATE OF NEBRASKA, APPELLEE, V. FRANK HERNANDEZ,
APPELLANT.

493 N.W.2d 181

Filed December 18, 1992.    No. S-91-675.

Byron M. Johnson, Scotts Bluff County Public Defender, for appellant.

Don Stenberg, Attorney General, and Barry Waid for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

Pursuant to verdict, the defendant-appellant, Frank Hernandez, was adjudged guilty of violating Neb. Rev. Stat. §§ 28-405(a)(4) [Schedule II] and 28-416(1)(a) (Reissue 1989) by

possessing with the intent to deliver a controlled substance, cocaine. He was thereafter sentenced to imprisonment for a period of not less than 3 nor more than 5 years. He asserts, in summary, that the district court erred by (1) failing to quash the jury panel, (2) receiving certain evidence, (3) finding the evidence sufficient to sustain the conviction, (4) improperly instructing the jury, (5) failing to find he was deprived of a fair trial through the misconduct of the plaintiff-appellee State at trial, and (6) imposing an excessive sentence. We affirm.

## II. BACKGROUND

In their effort to identify and apprehend drug dealers, law enforcement officers worked with a paid informant. The officers would first search the informant and his vehicle to assure that he was not in possession of controlled substances or money they had not supplied to him, fit him with a body transmitter, and send him to purchase drugs from suspects he had earlier identified as drug dealers. The officers listened to the transactions as they occurred via the transmitter with which they had fitted the informant.

On August 29, 1990, the informant was sent to attempt to make a drug purchase from a third party. While officers listened, the informant met the third party at the latter's apartment and made arrangements to purchase some cocaine. The third party then left his apartment in the informant's vehicle and drove to Hernandez' house. The third party entered the house, remained for 5 or 6 minutes, and then returned to his own apartment, where he delivered to the informant one-half or one-fourth of a gram of cocaine. The cocaine was packaged in a small paper bindle (a piece of paper folded flat such that the cocaine powder would not fall out, a common delivery system for cocaine). Shortly thereafter, the informant turned the purchase over to the officers.

As a result, Hernandez was targeted for further investigation. A video camera and a time-lapse video cassette recorder surveillance of his residence was commenced on December 10, 1990, which permitted 24-hour-a-day monitoring. This surveillance revealed stop-and-go traffic to Hernandez' residence; that is, persons arrived by automobile

and departed after going inside for a very short period of time. Officers then personally watched the Hernandez residence during the evenings of December 19, 26, and 27, 1990. During this period, they saw at least two persons who had previously been arrested for narcotics violations enter and leave Hernandez' house as described earlier.

Armed with this information, the officers, on December 28, 1990, obtained a warrant which authorized the search of Hernandez' person and residence for "cocaine, cocaine related paraphernalia, cutting agents, records of transactions of cocaine sales, monies that are the result of cocaine sales, and an electronic scale." (A "cutting agent" is a substance having a lesser value than the controlled substance with which the agent is mixed both to increase the volume of the material to be sold and to dilute the purity of the controlled substance.)

At 7:55 p.m. on December 28, 1990, five officers arrived at the Hernandez residence to execute the warrant. When the officers knocked at the door, it was opened by an occupant, whereupon the officers rushed in with weapons drawn and told the two men in the living room to get down. Hernandez was found in a bedroom standing next to a bed. Although the officers repeatedly told him that they had a search warrant and to get down, Hernandez refused to comply and said he was going to take care of his dog.

The officers then forced Hernandez down on the bed, handcuffed him after a brief struggle, and searched him. In the left front pocket of his pants, they found a plastic bag tied shut with a knot, another smaller plastic bag, and $80 in cash. The tied plastic bag was later analyzed and found to contain 3.642 grams of cocaine and mannitol, a common cutting agent.

Five clear plastic bags of "white crosses," that is, white double-scored tablets, were also found in the bedroom. One bag of tablets was found in the top drawer of Hernandez' chest of drawers. A second bag was found in a woman's purse in the closet. Three separate bags of tablets were found in a drawer of Hernandez' wife's dresser. The tablets were analyzed and shown to contain ephedrine.

Hernandez's wife claimed that she had ordered the ephedrine tablets as a diet aid and as a pep pill and had taken them out of

the original bottle of 1,000 pills to count them to make sure she got the full amount and then put them in the clear plastic bags to carry in her purse.

A reloading scale designed for reloading ammunition and measuring weight in grains was found set up for use on top of the wife's dresser. Behind that on the dresser was a scale box, on the inside of which were notations converting grains to ounces and grams as follows: "quarter, 109.4," "G15.6," "7.8," and "3.9." According to one officer, in converting ounces to grams, then to grains, 109.4, on the bases of these notations, converts to one-fourth of an ounce, 15.6 to one-eighth of an ounce, 7.8 to a gram, and 3.9 to one-half of a gram. (There appears to be an error in either the calculations or the transcription of the testimony. If 15.6 converts to one-eighth of an ounce, 109.4 could not convert to one-fourth of an ounce. Furthermore, there is testimony that one-eighth of an ounce is approximately 3.5 grams. Thus, if one-eighth of an ounce reads 15.6 on the scale, a gram could not read 7.8 and meet the ratio.)

A second, smaller scale, sometimes referred to as a postage scale, was found on top of Hernandez' chest of drawers. The postage scale is designed to measure smaller amounts, and gram measurement notations had been added to it.

Also found was a spiral notebook containing a handwritten list of numerical codes used by law enforcement agencies in communicating via radio. Approximately 45 of the codes were defined. In the notebook was a loose sheet of paper with a handwritten list of police agencies and radio frequencies. In addition, a computer-printer-generated list of radio frequencies distributed compliments of an electronics chainstore was also found. These items were seized because drug dealers frequently possess scanners and lists of frequencies used by law enforcement agencies. However, no scanner was found.

The officers also took from the bedroom a magazine containing cutout squares of paper which had the "beginnings of a pharmacy fold." The magazine paper was very slick and of the type often used to package drugs, as they do not adhere to the paper.

Also seized was a small glass tray found on top of the wife's dresser containing a residue of white powder. While a positive

identification of the powdery substance was not possible, tests nonetheless suggested the presence of cocaine.

Hernandez explained that he had suffered an electrical shock in a work-related accident in October 1989 wherein he injured his back and neck and was prescribed numerous pain pills and muscle relaxants by his physician. As the pain continued, he resorted to cocaine in an effort to ease the pain.

Hernandez claims that he first purchased cocaine in February 1990, buying one-fourth of a gram approximately once a month. After receiving an insurance check for $530 to $540 a couple of weeks before Christmas for damages to his parked automobile, he purchased an "eight-ball," or approximately one-eighth of an ounce, for $200. He denied that he had ever before purchased that much cocaine at one time, claiming that he bought the eight-ball in a bar from someone he did not know and had never seen before.

Hernandez admitted that his cocaine use did "kind of get away from" him. On the evening of December 28, 1990, when he was arrested, he had gone into his bedroom to sneak the eight-ball of cocaine he had hidden in the wall of his bedroom while his brother-in-law and cousin were in the living room and his wife was in the shower. Hernandez said:

> I never even used it. I've never used it before, and I didn't even really know how. I just knew what I had bought, what they had told me I had bought, and I never cut it up before. I've never par — I mean split it up or done anything with it like that.

But he admitted he was "thinking about taking cocaine" at that time. Hernandez explained that he had removed the cocaine and the reloading scale from a hole in the wall between the bedroom closet and the bathroom when the police arrived. Although he admitted that he was going to try to use the scale to weigh the cocaine, he claimed that he had never actually used it for that purpose. He also admitted that he had used his wife's glass tray on the morning of his arrest to "snort" cocaine by making a pile of it and using a dollar bill as the device through which to inhale it.

Hernandez also claimed that he had bought the scale 2 or 3 weeks earlier for his brother-in-law to give to his father and that

he hid the scale in the meantime. His brother-in-law testified that Hernandez had previously discussed the possibility of purchasing a reloader and reloading scale to be used by his father. He also testified that he and Hernandez used the smaller postage scale to weigh carburetor float parts.

The officer in charge of the investigation, who had a total of 12 years' experience as a police officer and had investigated narcotics cases for 5 years, testified that the common quantities and purchase prices for end-user purchases are: one-fourth grams, $25 to $40; one-half grams, $50 to $60; grams, $100 to $120; eight-ball, which is approximately 3.5 grams, $225 to $350. According to him, most straight users purchase $^1/_4$-gram and $^1/_2$-gram amounts.

Hernandez' mother and sister testified to his good character and truthfulness and that to their knowledge he did not use or sell drugs.

## III. ANALYSIS

With that background we turn our attention to an analysis of the summarized assignments of error.

### 1. JURY PANEL

In connection with the first summarized assignment of error, Hernandez urges that the district court erred by failing to sustain his challenge to the jury panel "for the reason that persons of Spanish or Mexican heritage had been systematically and unconstitutionally excluded" from potential jury service.

Hernandez asserts that the composition of the jury violated both his Sixth Amendment right to be tried by a jury fairly representative of the community and his equal protection right to have members of his particular discernible minority group represented.

He bases his claim upon the showing that while approximately 14 percent of Scotts Bluff County's population of 36,025 has Hispanic surnames, only 2, or 2.7 percent, of the 74-person venire had Hispanic surnames, and that of the 30 names drawn for potential service in this case, none had such names.

The law controlling disposition of these claims was recently reviewed in *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32

(1992); no useful purpose would be served by reiterating that law here—we simply observe that there is nothing in this record which establishes that Hernandez is a member of any cognizable group of the population or that any under-representation of any group is due to its systematic exclusion in the jury selection process.

## 2. RECEIPT OF EVIDENCE

In connection with the second summarized assignment of error, Hernandez asserts that the evidence of the transaction between the informant and the third party and of the traffic patterns at Hernandez' home was improperly admitted, as it constituted hearsay and was otherwise not relevant.

We begin by noting that although Hernandez states hearsay evidence was received, he points to no place in the record which demonstrates such to have been the case. Neb. Ct. R. of Prac. 9D(1)f and g (rev. 1992) and its predecessors have long required that factual recitations be annotated to the record. The lack of such an annotation may result in an appellate court's overlooking a fact pertinent to the appeal. See *Alder v. First Nat. Bank & Trust Co.*, 241 Neb. 873, 491 N.W.2d 686 (1992). Since the claimed hearsay evidence, if any such exists, is not annotated to the record, nor was any such evidence noted in our detailed study of the record, we review this matter as if none exists. This treatment obviates Hernandez' claim that his right to confrontation under U.S. Const. amend. VI and Neb. Const. art. I, § 11, was somehow violated.

Hernandez also argues, however, that the testimony concerning what the officers saw transpire between the informant and the third party and concerning the traffic at Hernandez' house was not relevant and that even if it was relevant, its probative value was substantially outweighed by the potential of its unfair prejudice.

When the district court overruled Hernandez' objection to this evidence, it instructed the jury:

> [E]vidence that [Hernandez] may have had connection with [the third party] or any other incidents before the night of the search itself are being — any of these incidents are being received only for the limited purpose of helping

you decide whether the defendant had the intent and knowledge required by the charge on the night charged in this case . . . the night of December 28, 1990. It's being received for that limited purpose only, and you can consider evidence of any of these other incidents for that limited purpose and for no other purpose.

Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 1989), reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(2) is a rule of relevancy, and pursuant to Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1989), evidence which is not relevant is not admissible. *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992).

Rule 404(2) is an inclusionary rule permitting the use of uncharged misconduct evidence if the evidence is relevant for any purpose other than to show the defendant's propensity or disposition to commit the crime charged. *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992); *State v. Timmerman, supra*; *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991). However,

[r]ule 404(2) is subject to the overriding protection of Neb. Evid. R. 403, which provides for exclusion of otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Neb. Rev. Stat. § 27-403 (Reissue 1989).

*State v. Messersmith*, 238 Neb. at 930, 473 N.W.2d at 89.

As to the unfair prejudice concern, the *Timmerman* decision quoted from *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), as follows:

"We share petitioner's concern that unduly prejudicial evidence might be introduced under Rule 404(b). . . . We

think, however, that the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; *second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b)*; third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice . . . and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted."

(Emphasis in original.) *State v. Timmerman*, 240 Neb. at 85-86, 480 N.W.2d at 419.

While there can be no question that the evidence in question was admitted for a proper purpose, i.e., to show that Hernandez possessed the cocaine with the intent to deliver required by § 28-416(1)(a), that the evidence may have been at least marginally relevant to show Hernandez' intent, and that the district court gave an appropriate instruction limiting the use of the evidence, the crucial question is whether its potential for unfair prejudice outweighed its probative value.

We conclude that it did; unlike the situation in *Messersmith*, where the similar acts evidence was obtained through the testimony of two witnesses who claimed to have exchanged stolen property for drugs obtained from the defendant therein, in the case before us we have only observations that after the third party returned from Hernandez' house, he delivered some cocaine to the informant, and that persons previously arrested for narcotics violations were seen going to Hernandez' house. No one testified he saw Hernandez deliver any drugs to anyone.

However, that does not end our inquiry in this regard, for we must determine whether the erroneous receipt of this potentially prejudicial evidence worked to actually prejudice Hernandez.

We begin with the proposition that in a jury trial of a criminal

case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Messersmith, supra*.

In the trial of a criminal case, erroneous admission of evidence which is not cumulative may constitute harmless error beyond a reasonable doubt, when a defendant's conviction is supported by overwhelming evidence which has been properly admitted or admitted without objection. . . . In contrast with the preceding, we have expressed the "harmless error" standard pertaining to erroneous admission of cumulative evidence: "Erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted, or admitted without objection, supports the finding by the trier of fact."

*State v. Coleman*, 239 Neb. at 814-15, 478 N.W.2d at 358.

Here, the evidence erroneously admitted was for the purpose of showing intent to deliver in accord with the circumstantial evidence of past delivery. The items found in Hernandez' possession, upon the search of his house, including the quantity of cocaine, the reloading scale, the postage scale, the slick magazine paper cut in squares with the beginnings of a pharmacy fold, the handwritten list of codes used in law enforcement communications, the scanner frequency list, and the cutting agent, are more than adequate to support the finding of intent by the jury. Thus, the erroneously admitted evidence is cumulative and harmless beyond a reasonable doubt.

### 3. SUFFICIENCY OF EVIDENCE

The foregoing analysis foreshadows the resolution of the third summarized assignment of error, the claim that the evidence is not sufficient to support the conviction, in which connection Hernandez also asserts that the district court's denial of his motions for directed verdict was reversible error as well.

As we have frequently declared, in determining whether

evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Vance*, 240 Neb. 794, 484 N.W.2d 453 (1992); *State v. Lonnecker*, 237 Neb. 207, 465 N.W.2d 737 (1991); *State v. Zitterkopf*, 236 Neb. 743, 463 N.W.2d 616 (1990).

We have also written:

> " 'When an element of a crime involves existence of a defendant's mental process or other state of mind of an accused, such elements involve a question of fact and may be proved by circumstantial evidence.' " . . . [C]ircumstantial evidence may support a finding that a defendant intended to distribute, deliver, or dispense a controlled substance in the defendant's possession. . . .
>
> " 'Circumstantial evidence to establish that possession of a controlled substance was with intent to distribute or deliver may consist of the quantity of the substance, the equipment and supplies found with it; the place it was found; the manner of packaging; and the testimony of witnesses experienced and knowledgeable in the field.' "

*State v. Zitterkopf*, 236 Neb. at 748, 463 N.W.2d at 620.

As demonstrated by our analysis of the second summarized assignment of error, the evidence seized at Hernandez' house, in and of itself, is sufficient to support the conviction. Since that evidence was adduced in the State's case in chief, there can be no merit to Hernandez' claim that the district court erred in overruling his motions for directed verdict made at the close of the State's evidence and at the close of all the evidence.

Indeed, by adducing evidence after the State rested, Hernandez waived any error which might have existed in the

overruling of his motion at the close of the State's evidence. See *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991). In such a circumstance, our review is confined to the status of the record at the close of all the evidence, in connection with which we have proclaimed:

> In a criminal case a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. . . . In the consideration of a defendant's motion for a directed verdict, the State is entitled to have all its relevant evidence accepted or treated as true, every controverted fact favorably resolved for the State, and every beneficial inference reasonably deducible from the evidence.

*Id*. at 6-7, 468 N.W.2d at 609.

Obviously, then, a criminal defendant has no less a task in undertaking to show that he or she was entitled to a directed verdict than such a defendant has in undertaking to show that the evidence is insufficient to support a conviction.

### 4. JURY INSTRUCTION

In connection with the fourth summarized assignment of error, Hernandez asserts the district court should have defined "reasonable doubt" in the terms he requested rather than as it did.

The district court instructed the jury that "[a] reasonable doubt is one based upon reason and common sense after careful and impartial consideration of all the evidence. Proof beyond a reasonable doubt is proof so convincing that you would rely and act upon it without hesitation in the graver and more important transactions of life." This instruction differs from that recently approved in *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992), only in that the *Garza* instruction used the phrase " 'in the more serious and important transactions of life' " in place of the phrase "in the graver and more important transactions of life" and added a third sentence reading: " 'However, proof beyond a reasonable doubt does not mean

proof beyond all possible [sic] doubt.' " *Id.* at 958, 492 N.W.2d at 49.

Nonetheless, as did the instruction in *Garza*, the instruction questioned here required the jury to carefully and impartially consider all the evidence and convict Hernandez only in the event the jury concluded the evidence was so convincing that it would rely and act upon it in life's graver and more important matters. The questioned instruction thus accurately defines the requisite standard of proof without minimizing Hernandez' due process rights.

Since it is not error for a trial court to refuse to give a defendant's requested instruction where the substance of the requested instruction was covered in the instructions given, *State v. Samuels*, 205 Neb. 585, 289 N.W.2d 183 (1980), we need not concern ourselves with the instruction Hernandez tendered.

## 5. TRIAL CONDUCT OF STATE

In the fifth summarized assignment of error, Hernandez argues that he was deprived of a fair trial by certain of the prosecutor's statements during closing argument. He also argues in this connection that as the prosecutor had participated in the arrest, he was a potential witness and thus should not have acted as the State's attorney, for in arguing the case he confused in his own mind what the witness said at trial with what the prosecutor knew from his own observations.

However, we are directed to no objection in the bill of exceptions to any allegedly improper argument. So far as we can determine, complaint was first made in this regard in Hernandez' motion for new trial. As we have recently reaffirmed, an objection to the prosecutor's argument made after the jury has been instructed and has retired is untimely and for that reason will not be reviewed on appeal. *State v. Garza, supra.*

## 6. SENTENCE

In the sixth and last summarized assignment of error, Hernandez, without attempting to suggest what an appropriate sentence would be, seeks to convince us that the sentence imposed upon him is excessive. It is not.

The offense of which he was convicted is a Class II felony,

§ 28-416(2), punishable by imprisonment for a period of from 1 to 50 years, Neb. Rev. Stat. § 28-105(1) (Reissue 1989).

In reviewing sentences, this court has repeatedly stated that a sentence imposed within the statutory limits will not be set aside as excessive absent an abuse of discretion by the trial court. *State v. Hall, post* p. 92, 492 N.W.2d 884 (1992); *State v. Muratella,* 240 Neb. 567, 483 N.W.2d 128 (1992); *State v. Brandon,* 240 Neb. 232, 481 N.W.2d 207 (1992).

We find nothing in this record which suggests that the district court abused its discretion. What we do find is that, albeit for non-drug-related matters, Hernandez has been placed on probation three times in the past and that on one of those occasions he was unable to adhere to the terms imposed upon him.

### IV. JUDGMENT

The record failing to sustain any of the summarized assignments of error, we, as first said in part I, affirm the judgment of the district court.

AFFIRMED.