STATE OF NEBRASKA, APPELLEE, V. WAYNE K. BREWER, APPELLANT.
486 N.W.2d 477

Filed July 10, 1992.   No. S-91-204.

Thomas P. McKenney and Deborah D. Cunningham for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Following a jury trial, the defendant-appellant, Wayne K. Brewer, was adjudged guilty of first degree murder, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1989). He asserts that the trial court erred in (1) overruling his motion to suppress his statements to the interrogating officers and (2) admitting those statements into evidence. We affirm.

In view of the narrow scope of the inquiry presented by the summarized assignments of error, a detailed recitation of the facts surrounding the murder giving rise to this appeal is not required.

We thus turn immediately to Brewer's contentions in connection with the first assignment of error, that his various statements to the interrogating officers should have been suppressed because he was denied counsel and because the statements were in any event not given intelligently, knowingly, and voluntarily.

The murder had taken place in the early morning hours of March 21, 1990, and a search for Brewer had begun. Brewer arrived at an office of the Douglas County sheriff with his mother at approximately 11 o'clock that night. He was not then under arrest; in fact, as Officer Gary Kratina, Brewer's mother, and Brewer himself testified, Brewer was told he could leave at any time. Even though Brewer was not then in custody, he was,

nonetheless, at about 11:10 p.m., read a rights advisory form, which he initialed and signed. The form advised that the interrogator was a police officer; that Brewer had a right to remain silent and not make any statements or answer any questions, but that anything he said could and would be used in court; that he had a right to consult with a lawyer and have the lawyer present during questioning; and that if he could not afford a lawyer, one would be appointed for him by the court. The form included a statement that with the foregoing knowledge, Brewer was willing to talk with the interrogator.

According to Kratina, when Brewer signed the form he appeared to understand the questions, responded clearly, and did not seem to be under the influence of drugs or alcohol. Moreover, Kratina stated that no threats, force, promises, or coercion of any kind were used to obtain the confessions.

According to Kratina, Brewer did not confess to any involvement in the murder during the initial discussion he had with Kratina and Officer George Whitmore. Approximately an hour later, Brewer asked to speak with his mother and, according to Kratina, did so for 5 to 10 minutes. Kratina then reentered the room and asked Brewer whether he was ready to talk. Brewer hesitated, but the mother interjected and stated, " 'You know, Wayne, you know why we came out here. Tell the man what happened.' "

However, Brewer and his mother claim that when they were together, they requested that Brewer be given an attorney. The mother claims that Kratina told Brewer that "he couldn't get no lawyer appointed unless they went to court, and he couldn't do that unless he was arrested, and at that point he wasn't arrested." Brewer asserts that he asked for an attorney when he initially arrived at the sheriff's office and again before he made a statement. As did his mother, Brewer also stated that Kratina told him he could not have an attorney until he was charged.

Brewer's testimony and that of his mother were contradicted by several of the interrogating officers. Kratina testified that Brewer never requested an attorney, but he told Kratina that he and his mother, on the way to the sheriff's office, decided against getting an attorney—" 'we just decided we didn't need one, we would come out here and talk to you and tell you the

story; it wasn't going to make any difference if I talked to an attorney or not' . . . ." Officer Randall Brunckhorst testified that he never told Brewer he could not have an attorney or that he could not leave. Officer Mike Buglewicz also stated that he never told Brewer he could not have an attorney.

After Brewer had spoken with his mother, he proceeded to give an extensive confession to Kratina in his mother's presence. It was at this time that Brewer was first implicated in the crime. When Brewer was finished, Kratina testified that he left the room and returned with Brunckhorst, who had a tape recorder. At that point, Brunckhorst reviewed the previously signed rights advisory form with Brewer and then recorded his confession. At the beginning of this first taped statement, the voices of Brunckhorst and Brewer can be heard as Brewer acknowledged his rights and then waived those rights and gave a confession. At the end of the tape recording, Brewer confirmed that the confession was given freely and voluntarily, without any threats or promises. The confession concluded at 2:35 a.m. on Thursday, March 22, 1990.

Upon completion of the recorded statement, Brewer was told that he was going to be charged with criminal homicide and booked. Thereafter, Brewer led Buglewicz and Officer Neil Paulison to where the victim's automobile had been dumped into the Missouri River. Kratina testified that at 11 a.m. on March 22, he went to the correctional center where he again met with Brewer. Brewer was again read his rights and again signed a rights advisory form. Kratina did not threaten, force, or coerce Brewer into talking, nor did he make any promises in order to persuade Brewer to talk. During the interview, Brewer told Kratina where specific pieces of evidence could be found. At 3:30 p.m. on the same day, Kratina received a radio message from his office that Brewer wanted to speak to him. For the third time Brewer signed a rights advisory form, and for the fourth time he waived his rights. On this occasion Brewer told Kratina where additional items of evidence had been abandoned. Brewer then led Kratina to the location.

Brewer next asked to speak to the prosecutor familiar with the case. Brewer was thereupon returned to the sheriff's office, where he met Deputy County Attorney Samuel Cooper. For the

fourth time Brewer signed a rights advisory form, and for the fifth time he waived his rights. For the second time Brewer gave a tape-recorded statement. Recorded at the beginning of the tape are Brewer's affirmative responses to the questions on the advisory form. In fact, Cooper specifically reviewed Brewer's right to have an attorney present at that time and told Brewer directly that there were no promises and that in all likelihood Brewer would be charged with first degree murder the following day. Nevertheless, Brewer agreed to speak.

Resolution of the first assignment of error is controlled by the rule that in determining the correctness of a trial court's ruling on a motion to suppress, an appellate court will uphold the trial court's findings of fact unless those findings are clearly erroneous. See, *State v. Utterback*, 240 Neb. 981, 485 N.W.2d 760 (1992); *State v. Melton*, 239 Neb. 790, 478 N.W.2d 341 (1992). Specifically, a determination by a trial court that a statement was made voluntarily will not be disturbed on appeal unless clearly wrong. *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991). Moreover, in deciding whether a trial court's ruling is erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that the trial court has observed the witnesses testifying in regard to such motion. *State v. Utterback, supra*; *State v. Melton, supra*.

Implicit in the trial court's ruling on the suppression motion is the finding that Brewer did not ask for the services of an attorney. Given the conflict in the evidence in that regard, it cannot be said the finding is clearly wrong.

That brings us to the second aspect of the first assignment of error, the voluntariness of Brewer's statements. Although the burden of showing a confession to have been voluntary is upon the State, at a suppression hearing it need establish such only by a preponderance of the evidence. *State v. Cody*, 236 Neb. 69, 459 N.W.2d 195 (1990); *State v. Thomas*, 232 Neb. 490, 441 N.W.2d 186 (1989); *State v. Hayes*, 229 Neb. 53, 424 N.W.2d 624 (1988).

In order to be ruled voluntary, it must be shown at a suppression hearing that a

statement, admission, or confession was not the product of any promise or inducement—direct, indirect, or implied—no matter how slight. However, this rule is not to be applied on a strict, per se basis. Rather, determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made.

*State v. Melton*, 239 Neb. at 796, 478 N.W.2d at 347. Accord, *State v. Haynie, supra.*

In order to find a statement, admission, or confession involuntary and therefore in violation of due process rights, such as Brewer claims to have been the case here, "coercive police conduct is a necessary predicate." *State v. Hankins*, 232 Neb. 608, 623, 441 N.W.2d 854, 868 (1989). This court has identified examples of such conduct.

A nonexhaustive list of potentially material considerations in determining the voluntariness of statements in the context of inducements by prosecuting authorities includes whether (1) defendant is in custody at the time of the statement, (2) defendant is alone and unrepresented by counsel, (3) the promise or inducement is initiated by prosecuting officials as opposed to defendant or someone acting on his behalf, (4) defendant is aware of his constitutional and other legal rights, (5) the potentially incriminating statement is part of an abortive plea bargain, (6) the promise or inducement leading to the statement is fulfilled by prosecuting authorities, and (7) defendant is subjected to protracted interrogation or evidence appears on the record to show that coercion precludes the statement from being knowing and intelligent.

*State v. Haynie*, 239 Neb. at 487, 476 N.W.2d at 912.

The record is devoid of any instances where the conduct of the interrogating officers was coercive. Outside of Brewer's averment that he was denied his right to counsel, which has been discussed and dismissed previously, Brewer presents no instances where the interrogating officers coerced him into giving a statement. Brewer's conduct overwhelmingly supports the State's assertion that he fully and completely cooperated

with the sheriff's officers.

The record establishes that Brewer was read his rights on five separate occasions; signed four separate rights advisory forms; voluntarily appeared at the sheriff's office during the initial investigation; voluntarily showed the sheriff's officers where the victim's automobile had been abandoned; voluntarily telephoned Kratina, telling him where the items of evidence could be found and directing him to the location; and voluntarily asked to speak, and gave a taped confession, to the deputy county attorney. Moreover, both tape-recorded confessions demonstrate that Brewer was fully informed of his rights and the implications of talking. During the recordings, Brewer stated that he was giving the confessions voluntarily and that no threats had been made or promises given to him.

Brewer's assertion in the second assignment of error, that the trial court erred in permitting his confessions to be admitted into evidence, is subsumed in his claim that they were obtained unconstitutionally. Once it was properly determined at the suppression hearing that the statements were voluntary and not otherwise the product of an impermissible interrogation, the statements became admissible. See, *State v. Hall*, 237 Neb. 169, 465 N.W.2d 150 (1991); *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990); *State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985).

Because the record does not sustain the assignments of error, we, as stated earlier, affirm the judgment of the district court.

AFFIRMED.