STATE OF NEBRASKA, APPELLEE, V. CHRISTOPHER M. GARZA, APPELLANT.

492 N.W.2d 32

Filed November 20, 1992.    No. S-91-283.

Michael T. Levy, of Levy & Lazer, P.C., for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

Pursuant to a verdict, the defendant-appellant, Christopher

M. Garza, was adjudged guilty of first degree murder, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1989), and of using a firearm during the commission of a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1989). He was thereafter sentenced to life imprisonment for the murder and to imprisonment for a period of not less than 6²/₃ nor more than 20 years for the use of the firearm, the sentences to run consecutively. Garza assigns seven errors, which combine to assert that the district court (1) wrongly failed to suppress his statements, (2) wrongly failed to transfer the case to the juvenile court, (3) wrongly failed to quash the jury panel, (4) wrongly instructed the jury, and (5) wrongly failed to grant a new trial because of the prosecutor's conduct. We affirm.

## II. FACTS

When she was killed on March 21, 1990, the victim, Christina O'Day, was a 17-year-old high school senior. Garza, having been born on May 23, 1973, was then 16 years old, and Wayne K. Brewer, the other individual involved, see *State v. Brewer,* *ante* p. 24, 486 N.W.2d 477 (1992), was then 18 years old.

Beginning in March 1989, the victim's employer started working the night shift and thus arranged for the victim to spend the night at her house to take care of her 8-year-old daughter. The victim would drive to the employer's house between 10:45 and 11:10 p.m. and park her automobile in the garage; the employer would then go to work. On Mondays, the employer usually attended a university class from 7 to 9:45 p.m. and would go to work directly from the university.

Garza had met Brewer in February 1990 at a local fast-food restaurant where they both worked. Shortly thereafter, the two became friends and began to do things together on a regular basis.

Garza claimed that on Monday, March 19, 1990, he and Brewer went to visit with Garza's mother. Since it appeared that his mother was asleep, Garza drove out of the area, but missed a turn and ended up on the street where the victim was babysitting. He then saw the victim pulling into her employer's driveway and decided to stop and visit with her. Brewer, however, testified that the victim had not just pulled into her

employer's driveway, but that Garza had actually driven by the employer's house before turning around and stopping. Garza knew the victim from school and claimed to have been a former boyfriend. He also knew the victim babysat overnight during the week.

At 11:10 p.m., Garza and Brewer rang the employer's doorbell and the victim answered. She asked Garza what he was doing and told him to leave. Brewer and Garza then left. The employer, who happened to be home on this particular Monday night, had heard the doorbell ring; thinking it strange that someone would come to the house that late at night, she stood at the top of the steps in order to see who was at the door and was thus able at trial to identify Garza as the person who had been at her door.

The following Tuesday night, March 20, or early Wednesday morning, March 21, while driving to the area, Garza asked Brewer if he wanted to "rob" the employer's house. Brewer agreed to the plan, knowing full well that the victim and her employer's daughter would be in the house. Brewer and Garza then returned to the employer's house at approximately 2:30 on the morning of the 21st, with stealing as the avowed purpose.

After cutting the outside telephone line, Garza broke in through a basement window and let Brewer in through the front door. Brewer claims he immediately began looking for things to steal in the living and dining rooms. Brewer stated that sometime thereafter, he "heard the door open . . . looked down the hall and [saw] Garza and [the victim] go into the [employer's daughter's] room and told her to go back to sleep." Thus, it appears that Garza had gone to the upper level of the house, as Brewer then states that sometime later, Garza went downstairs and told Brewer, " 'Go have some fun.' " Brewer asserts that he originally refused to go upstairs, but after Garza mocked him, he went to the victim's bedroom. He found the victim on the bed. Her hands were tied over her head, and she was gagged with a scarf and hat but had no injuries. Brewer claims he was in the room for only 5 to 10 minutes, during which time he sexually assaulted the victim.

Brewer then went back downstairs and sat on the couch. Garza returned to the bedroom, then went back downstairs and

into the kitchen to get a 14-inch knife, and returned to the bedroom. As Garza went back upstairs, Brewer asked him what he was doing but received no response. Apparently a few seconds later, Brewer went upstairs and stood in the bedroom doorway where he saw Garza pulling away from the victim and "blood spurting in the air." Garza and Brewer went back downstairs and left the house.

According to Brewer, he and Garza then went in the victim's automobile to a location where the stolen items were placed in Garza's automobile. The victim's automobile was then taken to and pushed into the Missouri River. The stolen items were later discarded.

The employer's daughter testified that she woke up at 2:30 a.m. because she heard crying coming from the bedroom where the victim slept, but that when her door was opened, she only saw one man. The daughter stated that for the next 3 hours, she "heard whispering [and] crying [and her] birdcage door slam and [the] bird squeaking." She also "heard footsteps . . . the door slam when they were leaving, and . . . the garage, the garage open and shut."

When Dr. Blaine Roffman, an Omaha pathologist and coroner, was taken into the employer's house, he saw the victim's body lying partially out of the bed in a face-down position:

> [The body] was underneath the comforter when I first walked into the bedroom. And when the comforter was removed, the body was face down on the abdomen and the back being visible.
>
> . . . .
>
> . . . [T]here was a blue electrical cord wrapped around the neck, along with a blue scarf and a white hat.
>
> And the blue scarf and white hat initially were over the mouth and nose.
>
> And there was also pantyhose and a red strap of some type bound around both lower — both feet.

The autopsy evidenced numerous injuries: a deep "traumatic laceration" on the left side of the forehead; a "large area of swelling over the right forehead"; a deep blunt injury "between the eyebrows and upper portion of the nose"; "petechial

hemorrhages" around the neck caused by the electrical cord; a "laceration on the . . . inside surface, of the left upper lip"; a blackened left eye "which is a result of hemorrhaging in that soft tissue that surrounds the eye"; injuries caused by vaginal and anal penetration; two dark linear-pattern bruises on the right back side; a bruise on the left shoulder; and a bruise over the right hip. According to Roffman, all of these injuries, which were not life threatening, were inflicted, as evidenced by the bruising and hemorrhaging, while the victim was still alive.

There was also a large, gaping laceration on the right wrist which extended to the bone, severing all of the superficial tendons, as well as producing a 90-percent laceration of the radial artery and a nick in the ulnar artery. In addition, there were seven superficial lacerations on the wrists. Roffman reported that the large wrist laceration was inflicted while the victim was alive and continued to bleed profusely until she died.

In Roffman's opinion, the victim died as a result of three injuries, any one of which, alone, could have killed her: bleeding to death from the laceration on her wrist; strangulation as a result of the scarf, hat, and electrical cord tightly wrapped around her neck; or asphyxiation caused by the scarf and hat covering her mouth and nose and also by the position of her body lying halfway out of the bed with her face turned against the carpet. Roffman pointed out that after any of these injuries, the victim would have been conscious at least 3 to 5 minutes and then died. Roffman also stated that the victim could have been saved by simply untying the cord around her neck, changing the position of the body and removing the blockage to the mouth and nose, or placing a tourniquet on the arm, depending on which injury had been inflicted at the time.

Thus, if Brewer's testimony that he and Garza left the house immediately after Garza inflicted the wrist laceration and the daughter's testimony that the two left at 5:30 a.m. are accurate, the victim would have suffered for almost 3 hours before she finally died.

Garza has given three separate stories regarding his whereabouts on the morning of the murder. He gave his first version on the day of the murder. During the late morning on March 21, Garza received a telephone call from his brother's

girl friend, who told Garza that the police were looking for him in connection with the murder. Before noon, Garza's mother went home in order to take her son to the police station, as she, too, had discovered that the police were looking for him. Shortly thereafter, Garza and his mother went to the Omaha Police Division, arriving there just after noon.

At the police station, Garza told Officer Frank O'Connor that he and Brewer had been with each other on the 20th and 21st and that he stayed the night at Brewer's house. O'Connor testified that Garza said he knew the victim, had dated her a "couple times," and had seen her on the 19th. Garza also told O'Connor that he and Brewer had visited several friends in Omaha and Council Bluffs Tuesday evening and early Wednesday "and then returned to Brewer's residence where they stayed the rest of the night."

After talking to O'Connor, Garza traveled with Deputies Gary Kratina and Sam Christiansen to the office of the Douglas County sheriff for further questioning. Once there, Garza was read his *Miranda* rights and signed a rights advisory form waiving those rights. Kratina testified that Garza admitted knowing the victim and seeing her on March 19. Garza told Kratina that on the morning of the murder, he was at Brewer's house. Thereafter, Garza agreed to give saliva, fingernail, and hair samples, and to have his photograph taken. Kratina and O'Connor both saw scratches on Garza's arms. Since Garza was then not under arrest, he left the station. That evening Brewer went to the sheriff's department and discussed the killing.

Garza had disappeared but was located and arrested on April 6. After processing, Garza was taken to an interview room where O'Connor and Deputies Craig Madsen and James Westcott of the sheriff's office were present. When asked whether he wanted to talk to the officers, Garza responded "[Y]es." According to O'Connor, "He was quite adamant about that, he did want to, yes, he did want to talk to us." At this time, Westcott left the room to telephone his office with the information that Garza was going to make a statement. O'Connor began to read Garza his *Miranda* rights from a rights advisory form. When Garza was told he had a right to an

attorney and to have one present, he stated that he wanted his attorney, and questioning ended.

Madsen then left the room in order to inform the sheriff's office of that development. However, O'Connor remained in the interrogation room with Garza. At the suppression hearing, O'Connor testified that after sitting there several minutes, he, upon Garza's inquiry as to whether Brewer had "spilled his guts," told Garza that Brewer had taken his opportunity to tell his side of the story and had implicated Garza. O'Connor also told Garza that the tests being conducted on blood and semen at the scene would reveal who had been there, when in fact O'Connor did not know whether such tests were then being conducted. Garza then declared that he had been with Brewer but that he, Garza, had not killed the victim. At this point, Madsen returned to the interrogation room, and O'Connor asked Garza whether what he was saying was being said of his own free will. Garza replied that yes, he had been there, but that he had not killed the victim. O'Connor then asked Garza whether he would like to tell his side of the story, and Garza said they had gone to the house to "rob" it; that he had cut the screen and crawled in, entered the house, looked around, tied up the victim, and then gone downstairs, getting a videocassette recorder and other items while Brewer remained upstairs. Garza admitted having sexual intercourse with the victim, after which he went back downstairs, collected some items, put them in the automobile, and left. As he and Brewer were in the automobile, Brewer said he had killed the victim. In reply to O'Connor's question, Garza said that yes, he was "there when it happened." When asked whether he would be willing to give a tape-recorded statement, Garza repeated several times that it was first degree murder and "it don't make no difference," but would not permit a recorded statement.

O'Connor further testified that no promises, threats of force, or coercion was used, and Garza appeared "to be rational and understand the rights" explained to him. Madsen's testimony regarding Garza's statement harmonized with that given by O'Connor. Madsen also testified that no promises, threats, or coercion was used in an attempt to coerce Garza to give a statement.

The third and final version of Garza's whereabouts on the night of the murder occurred when he testified on his own behalf at trial. On that occasion, Garza denied ever having made any incriminating statements on April 6 and testified that he was out with Brewer on the 20th and early morning of the 21st, but that he finally dropped Brewer off at his house. Garza then went home and to bed.

Garza also testified that Brewer woke him up "early morning sometime" and told him that he had "robbed" the employer's residence and stolen the victim's automobile. Garza agreed to Brewer's request to transfer all of the stolen goods into Garza's automobile. The two then dumped the victim's automobile into the Missouri River. Thereafter, they returned to Garza's house, where Garza's grandmother told them that a babysitter had been killed. Garza claimed that he questioned Brewer about the murder, and Brewer, for the first time, confessed to the killing.

Garza's girl friend, Donna Coffin, testified that on Monday, March 19, Garza had shown her a picture of the victim and told her that he was mad at the victim. The girl friend also stated that a day before the murder Garza had asked her to provide an alibi for him in the event the police were looking for him. The girl friend did not know whether Garza was serious or in regard to what matter she might be questioned. When Garza went to the girl friend's house in April prior to being arrested by the police, Garza told her that he had seen the victim the night of the murder and that he and Brewer had broken into the house through the basement window in order to steal. Garza further told the girl friend that it was not until after they left the employer's residence that Brewer told him he had killed the victim. The girl friend's sister, Chris Coffin, also testified that Garza told her he had broken into the employer's house through a basement window and "robbed" it, but denied killing the victim.

Garza testified that the Coffins, Brewer, Madsen, and O'Connor all lied and committed perjury in their testimony, and expressed the view that he was the casualty of a conspiracy to convict him, as only he was telling the truth.

## III. ANALYSIS

Before proceeding to a consideration of the summarized assignments of error, it is appropriate to recall that under the provisions of § 28-1205, one who uses a knife to commit a felony which may be prosecuted in this state, or who possesses a knife during the commission of any such felony, commits the felony of "using firearms to commit a felony." Under the provisions of § 28-303, one commits the prosecutable felony of murder in the first degree if, among other ways, one kills another "in the perpetration of or attempt to perpetrate any sexual assault in the first degree . . . robbery . . . or burglary . . . ."

One who overcomes another "by force, threat of force, express or implied, coercion, or deception" and subjects that other to "sexual penetration" commits the prosecutable felony of first degree sexual assault. Neb. Rev. Stat. § 28-319 (Reissue 1989). The prosecutable felony of robbery is committed if one, "with the intent to steal . . . forcibly and by violence, or by putting in fear, takes from the person of another any . . . personal property of any value whatever." Neb. Rev. Stat. § 28-324 (Reissue 1989). One who "willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value" commits burglary, itself a prosecutable felony. Neb. Rev. Stat. § 28-507 (Reissue 1989).

### 1. Nonsuppression

The first summarized assignment of error asserts the district court incorrectly refused to suppress Garza's statements because they were extracted in violation of his *Miranda* rights and were involuntary.

There is no question that the State has the burden to establish by a preponderance of the evidence that a defendant's statement was voluntary and not given as the result of coercion. *State v. Brewer, ante* p. 24, 486 N.W.2d 477 (1992). See, also, *State v. Phelps, ante* p. 707, 490 N.W.2d 676 (1992).

In *State v. Haynie*, 239 Neb. 478, 490, 476 N.W.2d 905, 913 (1991), we observed that "[c]oercive police conduct is a necessary predicate to the finding that a confession is not

voluntary within the meaning of the due process clause of the 14th amendment." Factors to be taken into consideration in determining whether there was coercive action, thus negating the voluntariness of a defendant's statement, include that

> (1) defendant is in custody at the time of the statement, (2) defendant is alone and unrepresented by counsel, (3) the promise or inducement is initiated by prosecuting officials as opposed to defendant or someone acting on his behalf, (4) defendant is aware of his constitutional and other legal rights, (5) the potentially incriminating statement is part of an abortive plea bargain, (6) the promise or inducement leading to the statement is fulfilled by prosecuting authorities, and (7) defendant is subjected to protracted interrogation or evidence appears on the record to show that coercion precludes the statement from being knowing and intelligent.

*Id.* at 487, 476 N.W.2d at 912. In any event, voluntariness is determined by considering all the circumstances. *Id.*

The U.S. Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), proclaimed that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. Custodial interrogation takes place by " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Twohig*, 238 Neb. 92, 108, 469 N.W.2d 344, 355 (1991). If a defendant is in fact in custody or his or her movement is restricted, the procedural safeguards under *Miranda* require the defendant to be told that (1) he or she has the right to remain silent, (2) anything said can and will be used in court, and (3) he or she may consult an attorney, retained or appointed, and has a right to have one present during interrogation. *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989).

*Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), instructs that an accused, "having expressed his desire to deal with the police only through

counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." See, also, *Minnick v. Mississippi*, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990) (waiver of Fifth Amendment right occurs when accused has initiated conversation or discussions with the authorities). Thus, once *Miranda* rights have been invoked, they must be respected unless later waived.

In *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the U.S. Supreme Court concluded that the *Miranda* safeguards

> come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Since its decision in *Innis*, the U.S. Supreme Court, in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983), established a two-part test to determine the admissibility of a conversation between an accused and the police after the accused had earlier invoked his right to counsel. First, the further conversation must have been initiated by the accused as required by *Edwards v. Arizona, supra*. If the accused initiated the further conversation, the next question is whether there was a valid waiver of the right to counsel and the right to silence, that is, whether, under all the circumstances, there can be found to have been a knowing and intelligent waiver of those rights. On the issue of initiating the further conversation, the *Bradshaw* Court noted that

> [t]here are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an

accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

462 U.S. at 1045. The *Bradshaw* Court then concluded that the accused's question, asking what was going to happen to him, although ambiguous, was nonetheless more than a mere necessary inquiry arising out of the incidents of the custodial relationship. Rather, it evinced a willingness and a desire for a generalized discussion about the investigation. The *Bradshaw* Court thus concluded that the accused had indeed initiated the conversation which followed, during which he acknowledged that he understood he did not have to talk. The officer then suggested the accused might help himself by taking a polygraph examination. The next day, after the accused waived in writing his *Miranda* rights, he submitted to a polygraph examination. After the examiner told the accused that the examiner did not believe the accused had told the truth, the accused recanted his earlier story and made inculpatory statements which were admitted at trial. In reversing the state's reversal of the conviction, the U.S. Supreme Court wrote that there existed no reason to dispute the trial court's finding that the inculpatory statements were voluntary and the result of a knowing waiver of the accused's right to remain silent.

In considering these matters, we wrote in dictum that an inculpatory statement made after the accused was shown police reports of other crimes in which he was thought to have been implicated and after he had invoked his right to remain silent was inadmissible. *In re Interest of Durand. State v. Durand*, 206 Neb. 415, 293 N.W.2d 383 (1980). We reasoned therein that showing the reports raised the specter of other prosecutions, placing the accused under a compulsion to speak, and thus rendered the statement involuntary. In *State v. Joy*, 218 Neb. 310, 353 N.W.2d 23 (1984), an officer told the accused after she had said her attorney had told her to remain silent that she could trust the officers and that if she knew anything, it would be best for her to cooperate and truthfully tell what she knew. In ruling that the accused's later inculpatory statement must be suppressed, we declared that once an accused invokes his or her

constitutional rights to remain silent and to the services of an attorney, the authorities must refrain from initiating further conversations and must scrupulously honor the accused's request.

However, here, unlike the situation in *Durand*, there was no threat of prosecution of unrelated crimes, nor, unlike the situation in *Joy*, did O'Connor initiate further conversations. Garza originated the conversations by asking, in effect, what Brewer had said. The situation at hand is more like that presented in *State v. Pittman*, 210 Neb. 117, 313 N.W.2d 252 (1981). Therein, after the accused had asked to talk to his attorney, police officers stopped questioning him and prepared to leave the room. The accused then remarked that he was being "railroaded" by an accomplice, and an officer responded by stating that they had only one side of the story and would be happy to hear the accused's side. Thereafter, the accused began to discuss the matter with the officers and responded to their questions. In affirming the conviction, we noted that *Miranda* does not protect an accused, even though he has requested counsel, from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.

Whether a statement is voluntary or the result of State coercion or promise is a question of fact. *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991). Moreover, in determining the correctness of a trial court's ruling on a motion to suppress, an appellate court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Coleman, ante* p. 731, 490 N.W.2d 222 (1992); *State v. Phelps, ante* p. 707, 490 N.W.2d 676 (1992); *State v. Brewer, ante* p. 24, 486 N.W.2d 477 (1992); *State v. Utterback*, 240 Neb. 981, 485 N.W.2d 760 (1992). Additionally,

> in deciding whether a trial court's ruling is erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that the trial court has observed the witnesses testifying in regard to such motion.

*Brewer, ante* at 28, 486 N.W.2d at 480. Accord *State v.*

*Coleman, supra.* Thus, a trial court's preliminary determination that a statement was made voluntarily will not be disturbed on appeal unless clearly wrong.

The district court here found that Garza had confessed voluntarily, and thus denied Garza's suppression motion. We cannot say the district court's ruling is clearly wrong. By asking whether Brewer had "spilled his guts," Garza demonstrated a willingness and desire for a generalized discussion about the case. He then, after demonstrating that he knew and understood his rights to counsel and to remain silent by having once invoked them, chose to discuss the case with the police. See *U.S. v. Risnes*, 912 F.2d 957 (8th Cir. 1990). Although after Garza asked his question the police said that tests would reveal who was present, they neither threatened Garza nor promised him anything.

## 2. Nontransfer to Juvenile Court

The next summarized assignment of error asserts that the district court improvidently refused to transfer jurisdiction over Garza to the juvenile court.

Neb. Rev. Stat. §§ 43-245(5) and 43-247 (Reissue 1988) provide that in cases involving felony offenders under the age of 18, the juvenile court and the district court shall have concurrent jurisdiction. Whether the case should be transferred is determined by considering (1) the type of treatment that would benefit the defendant; (2) whether the alleged offense included violence or was committed in an aggressive and premeditated manner; (3) the motivation for the commission of the offense; (4) the age of the defendant and circumstances of any others involved in the crime; (5) the prior history of the juvenile; (6) the sophistication and maturity of the juvenile; (7) whether there are facilities or programs within the juvenile system to rehabilitate the juvenile; (8) whether the best interests of the juvenile and security of the public require custody; and (9) any other matters relevant to the decision. Neb. Rev. Stat. § 43-276 (Reissue 1988).

An appeal from the denial of a transfer to juvenile court is reviewed for an abuse of discretion. *State v. Doyle*, 237 Neb. 60, 464 N.W.2d 779 (1991); *State v. Phinney*, 236 Neb. 76, 459

N.W.2d 200 (1990). With respect to the factors by which transfer is determined, we have stated:

There is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. For retention of the proceedings as a prosecution of a criminal offense, the court need not resolve every factor against the juvenile. Also, there are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified in the statute. [Citations omitted.]

The statutory criteria or factors of [§ 43-276] disclose a balancing test by which public protection and societal security are weighed against practical and not problematical rehabilitation of the juvenile. [Citations omitted.] "Rehabilitation has traditionally played a key role in the treatment of young offenders. . . . Nevertheless, the concept of deterrence and the need to balance individual justice with the needs of society—a balancing process that is basic and fundamental to the general scheme of the criminal law—also have a place in the juvenile justice system."

*State v. Alexander*, 215 Neb. 478, 486, 339 N.W.2d 297, 301 (1983).

The district court entertained Garza's motion to transfer the case to juvenile court on August 23, 1990. By that time, the district court had heard the evidence on Garza's suppression motion; had, at Garza's request, taken judicial notice of the evidence it heard 2 days earlier on Brewer's motion to suppress certain evidence in his case; and had before it the affidavit describing the crime upon which the warrant for Garza's arrest was issued. The parties had also stipulated to Garza's date of birth. At the conclusion of the hearing, the district court denied the transfer motion and, in an order dated September 27, 1990, wrote:

1. There is evidence that the alleged offense included violence and was committed in an aggressive manner.

2. The motivation for the commission of the offense.

3. The age of the defendant and the age of the co-defendant allegedly involved in this offense.

4. The best interests of the defendant and the security of the public may require that the defendant continue in custody for a period extending beyond his minority.

The record clearly supports the district court's conclusion to retain jurisdiction of the case, and the ruling thus cannot be said to have constituted an abuse of discretion. Although Garza was but 16, he was charged with violent adult crimes; he was an obvious threat to the public and, if convicted, could not easily be rehabilitated in the juvenile correctional system nor properly punished for the atrocities he would be adjudged to have committed.

### 3. PRESERVATION OF JURY PANEL

In the third summarized assignment of error, Garza complains that (a) the district court should have quashed the jury panel because its makeup violated his Sixth Amendment right to be tried by a jury fairly representative of the community and violated his equal protection right to have members of his particular discernible minority group represented, and (b) the requirement of Neb. Rev. Stat. § 25-1601 (Reissue 1989), that jurors be citizens of the United States and read, speak, and understand the English language, contributes to discrimination against Hispanics.

As a result of the pretrial publicity, Garza and the plaintiff-appellee, State of Nebraska, agreed to have the jury selected in North Platte, Lincoln County, and driven to Omaha for the trial. Before accepting this agreement, the district court reviewed with Garza his right under Neb. Const. art. I, § 11, to a "speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." Garza expressly waived his right to a Douglas County jury and agreed to a jury selected from Lincoln County, basically from North Platte.

Nonetheless, prior to the selection of the jury, Garza moved to quash the jury panel, arguing that "the panel contains no blacks or other persons of color or Hispanics, with the exception of the two panel Mexican-Americans . . . ." The motion to strike the jury panel was renewed after the jury had been selected. In support of his motion, Garza offered in

evidence a list of the potential jurors and the juror qualification forms. Contrary to Garza's assertion, the juror forms do not reveal the ethnic background of the potential jurors. Moreover, we have not been directed to anything in the record which establishes that Garza is a member of any cognizable group of the population. Nonetheless, his arguments assume that he is Hispanic and that, as such, he is a member of a distinctive and cognizable racial group; we, for the purpose of this analysis, assume the same.

(a) Sixth Amendment and Equal Protection

In *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), the U.S. Supreme Court observed that in order to establish a prima facie violation of the fair-cross-section requirement under the Sixth Amendment, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

The U.S. Supreme Court has stated that in equal protection challenges the burden is on a defendant to " 'prove the existence of purposeful discrimination.' " *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Purposeful discrimination may be established by proof of a disproportionate impact, which is demonstrated by "showing that the defendant's cognizable racial group has not been summoned for jury service over an extended period of time; or that his group is substantially underrepresented on his venire and that the venire was chosen under a practice providing the opportunity for discrimination." *U.S. v. Garcia*, 836 F.2d 385, 388 (8th Cir. 1987). See *State v. Perez*, 235 Neb. 796, 457 N.W.2d 448 (1990).

In reliance upon those rules, the defendant in *State v. Perez, supra*, argued that the State had unconstitutionally engaged in the "systematic and unconstitutional exclusion of persons of Spanish descent" in the jury selection. *Id*. at 803, 457 N.W.2d at 454. In support of his argument, the defendant proffered two

affidavits. The first cited a 1980 census report which disclosed a total of 38,344 people in Scotts Bluff County, including 4,714 persons of Hispanic descent. The second affidavit was from an official who reviewed the process by which the court compiled the venire list for the defendant's trial. The *Perez* court, in concluding that the defendant had failed to show discrimination, recited the standards set by the U.S. Supreme Court in cases involving jury selection challenges under the Sixth Amendment and Equal Protection Clause, stating: "On appeal, defendant merely argues that an underrepresentation exists. He completely fails to address the issues of systematic exclusion and purposeful discrimination. On this basis his argument on appeal must be rejected." *Id.* at 806-07, 457 N.W.2d at 456.

We have consistently held that a defendant has no right to a petit jury composed in whole or in part of members of his or her race, *State v. Pratt*, 234 Neb. 596, 452 N.W.2d 54 (1990); *State v. Venable*, 233 Neb. 309, 444 N.W.2d 907 (1989); *State v. Kitt*, 231 Neb. 52, 434 N.W.2d 543 (1989), and that the absence of members of the defendant's race in the jury, standing alone, does not support a claim of improper racial composition, *State v. Falkner*, 224 Neb. 490, 398 N.W.2d 708 (1987). A defendant cannot, under either a Sixth Amendment or an equal protection challenge, simply allege that no minorities are on the jury, but has the burden of establishing systematic exclusion and purposeful discrimination.

Like the defendant in *Perez*, Garza has not met the threshold obligation of establishing a prima facie case and thereby shifting the burden to the State. Garza's sole evidence is the fact that two members of the venire had Hispanic surnames and neither was placed on the jury. The U.S. Court of Appeals for the Second Circuit has stated that for purposes of determining whether the defendant has been denied a cross-section of the community, "[s]tereotypical ethnic or religious characterizations of surnames are unreliable and only tenuous indicia of a jury's makeup." *U.S. v. Gelb*, 881 F.2d 1155, 1161-62 (2d Cir. 1989), *cert. denied* 493 U.S. 994, 110 S. Ct. 544, 107 L. Ed. 2d 541. Certainly, evidence that two potential jurors had Hispanic surnames, by itself, is not convincing.

Neb. Rev. Stat. §§ 25-1627 and 25-1628 (Reissue 1989) require that the jury commissioner, in the presence of a judge, select a key number, which is then used to select a jury panel from voter registration and licensed driver lists. "The proposed juror list shall be derived by selecting from the master list the name of the person whose numerical order on such list corresponds with the key number and each successive tenth name thereafter." § 25-1628. Once the names are chosen, the proposed jurors are mailed a juror qualification form, and at some point they are summoned to appear for jury duty. Neb. Rev. Stat. § 25-1629 (Reissue 1989). This process has repeatedly been found valid and racially neutral under the Nebraska Constitution. *State v. Fallis*, 205 Neb. 465, 288 N.W.2d 281 (1980); *State v. Addison*, 198 Neb. 442, 253 N.W.2d 165 (1977); *State v. Wright*, 196 Neb. 377, 243 N.W.2d 66 (1976); *State v. Casados*, 188 Neb. 91, 195 N.W.2d 210 (1972). As written in *State v. Gutierrez*, 187 Neb. 383, 385, 191 N.W.2d 164, 166 (1971):

> It is difficult to conceive of a fairer or more practical method of selecting jurors than that used in Nebraska. The names are drawn by lot from lists of voters or registrants. The system is clearly within constitutional limits and renders impossible an intentional exclusion of any element of the population in a state or county where the privilege of voting is open to all who have attained the age required of an elector.

Moreover, the use of voter registration lists as a means of selecting jurors has been approved by courts throughout the country. See, e.g., *United States v. Daly*, 573 F. Supp. 788 (N.D. Tex. 1983); *State v. Pittman*, 569 S.W.2d 277 (Mo. App. 1978); *U.S. v. Cecil*, 836 F.2d 1431 (4th Cir. 1988); *State v. Tillman*, 750 P.2d 546 (Utah 1987); *State v. Sellers*, 39 Wash. App. 799, 695 P.2d 1014 (1985).

Garza offers no statistical evidence of racial makeup in the community or of substantial underrepresentation of any cognizable racial group, nor does he suggest in any fashion how the State systematically discriminated against an identifiable group. Furthermore, Garza's claim that the juror questionnaire forms require race identification is wrong. As has been

articulated, the absence of diverse racial representation on a jury, without evidence of intentional discrimination, is insufficient to uphold a constitutional challenge.

(b) Language and Citizenship Requirements

In connection with this second aspect of the third summarized assignment of error, Garza asserts that migrant farmworkers in Lincoln County, who are mostly Hispanic, are excluded from jury service, although they represent a discernible group of the population, because they neither read, speak, nor understand the English language, nor are they citizens of the United States. However, as the U.S. Supreme Court wrote in *Foley v. Connelie*, 435 U.S. 291, 296, 98 S. Ct. 1067, 55 L. Ed. 2d 287 (1978):

> It is no more than recognition of the fact that a democratic society is ruled by its people. Thus, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions. . . . *Similar considerations support a legislative determination to exclude aliens from jury service.*

(Emphasis supplied.)

In *Perkins v. Smith*, 370 F. Supp. 134 (D. Md. 1974), *aff'd* 426 U.S. 913, 96 S. Ct. 2616, 49 L. Ed. 2d 368 (1976), the plaintiff claimed a violation of equal protection rights under both the 5th and 14th Amendments, arguing that 28 U.S.C. § 1865(b) (1988), which prohibits aliens from serving on a jury and requires potential jurors to be able to read, write, and understand English, is discriminatory. The court, however, ruled that the exclusion of aliens from petit and grand jury service in both state and federal courts did not deny the aliens equal protection. "[T]he state has a compelling interest in the restriction of jury service to those who will be loyal to, interested in, and familiar with, the customs of this country." 370 F. Supp. at 138. The *Perkins* court emphasized that a trial by jury is one of the principal foundations of our nation and that service on such should be reserved to those individuals who are citizens. See, also, *United States v. Toner*, 728 F.2d 115, 130 (2d Cir. 1984) ("neither due process nor equal protection of the

law is involved in the time-honored federal system of drawing petit and grand jurors only from citizens of this country"). See, *United States v. Gordon-Nikkar*, 518 F.2d 972 (5th Cir. 1975); *United States v. Armsbury*, 408 F. Supp. 1130 (D. Or. 1976). The Massachusetts Supreme Court has accurately noted that "it is undeniable that some aliens do not possess these requisite attributes [of citizenship] and jury service is too critical to the just operation of the court system to place it in the hands of those who are not able to carry out the duties of such service." *Commonwealth v. Acen*, 396 Mass. 472, 482, 487 N.E.2d 189, 196 (1986).

Except for the exclusion of aliens from positions intimately related to the process of democratic self-government, state law that discriminates on the basis of alienage can be sustained against equal protection attack only if it can withstand strict scrutiny by advancing a compelling state interest by the least restrictive means available. *Bernal v. Fainter*, 467 U.S. 216, 104 S. Ct. 2312, 81 L. Ed. 2d 175 (1984). As was therein explained:

> The rationale behind the political-function exception is that within broad boundaries a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community. Some public positions are so closely bound up with the formulation and implementation of self-government that the State is permitted to exclude from those positions persons outside the political community, hence persons who have not become part of the process of democratic self-determination.

467 U.S. at 221. Consequently, minimum scrutiny is required when a political function is involved. *Id.* See, *Foley v. Connelie, supra* (police may be required to be citizens); *Ambach v. Norwick*, 441 U.S. 68, 99 S. Ct. 1589, 60 L. Ed. 2d 49 (1979) (states may require teachers to be citizens); *Cabell v. Chavez-Salido*, 454 U.S. 432, 102 S. Ct. 735, 70 L. Ed. 2d 677 (1982) (states may require probation officers to be citizens). As observed in *Commonwealth v. Acen*, 396 Mass. at 481, 487 N.E.2d at 195: "Jury service clearly lies at the heart of Anglo-Saxon democratic self-government and falls within the *Bernal* political function exception." Without further

discussion, it is sufficient that the U.S. Supreme Court, in *Foley v. Connelie, supra*, has acknowledged in dictum a state's right to restrict aliens from participating in the jury process. Nebraska's statute serves a reasonable interest in restricting potential jurors to those individuals who understand the American form of government and are committed to the interests of this nation. Accordingly, citizenship is a legitimate prerequisite to jury duty.

Furthermore, allegations of denying noncitizens the right to serve as jurors also fail under a Sixth Amendment analysis. As noted earlier, the *Duren* three-prong test requires a showing of underrepresentation of a suspect group in a cross-section of the community. As it has been shown that a state may restrict noncitizens from serving as jurors, the cross-section requirement is not invoked.

Like citizenship, the requirement that judicial affairs be in English has also been found both reasonable and important in other jurisdictions. *Acen, supra; United States v. Benmuhar*, 658 F.2d 14 (1st Cir. 1981); *Miranda v. United States*, 255 F.2d 9 (1st Cir. 1958). In *State v. Jett*, 111 N.M. 309, 805 P.2d 78 (1991), the New Mexico Supreme Court held that it was necessary for the jurors to speak English. " 'It is self-evident that a juror who does not possess a working knowledge of English would be unable to serve because he cannot possibly understand the issues or evaluate the evidence to arrive at an independent judgment as to the guilt or innocence of the accused.' " *Id.* at 313, 805 P.2d at 82, quoting *State v. Gallegos*, 88 N.M. 487, 542 P.2d 832 (N.M. App. 1975), *cert. denied* 89 N.M. 6, 546 P.2d 71. The Idaho Supreme Court, in holding that individuals lacking the capability to converse in and understand English could not sit as jurors, remarked:

> It would be patently unreasonable for this Court to require the state of Idaho to utilize jurors who are not proficient in the English language, unable to understand testimony, directions of the court, or read exhibits and instructions. It is not difficult to perceive that the State has a significant interest in the integrity of the jury system, and that that interest is manifestly and primarily advanced by limiting jurors to those who are capable of

> understanding the proceedings. As long as the qualification is equally administered as to all foreign language speakers there is no constitutional infirmity in the requirement that jurors be competent in English.

*State v. Paz*, 118 Idaho 542, 552, 798 P.2d 1, 11 (1990).

As the New Mexico court observed, the requirement that jurors speak English also promotes efficiency within the judicial system, as "allowing an unqualified juror to serve in a criminal case may constitute a constitutional violation" and lead to further litigation. *State v. Jett*, 111 N.M. at 313, 805 P.2d at 82. See *United States v. Rouco*, 765 F.2d 983 (11th Cir. 1985) (defendant alleged juror was not proficient in English and therefore he was denied a fair and impartial jury).

Section 25-1601 promotes the interests of the state's judicial process by assuring that jurors can understand the proceedings.

The trial court's findings that there was no discrimination in the selection of a jury are not to be reversed on appeal unless clearly erroneous. *State v. Venable*, 233 Neb. 309, 444 N.W.2d 907 (1989). The district court was not clearly wrong in concluding that there was no discrimination during the jury selection.

### 4. JURY INSTRUCTION

In the fourth summarized assignment of error, Garza contends that the district court erred in instructing the jury as to the meaning of reasonable doubt. The questioned instruction reads as follows:

> A reasonable doubt is one based upon reason and common sense after careful and impartial consideraion [sic] of all the evidence. Proof beyond a reasonable doubt is proof so convincing that you would rely and act upon it without hesitation in the more serious and important transactions of life. However, proof beyond a reasonable doubt does not mean proof beyond all posssible [sic] doubt.

Garza argues that the questioned instruction is misleading "in that it combines definitions of two separate terms, i.e. 'reasonable doubt' and 'proof beyond a reasonable doubt.' " Brief for appellant at 38. In place of the questioned instruction,

Garza proposed that the district court advise the jury that "[a] 'reasonable doubt' is one based upon reason after careful and impartial consideration of all the evidence."

In order to comport with the Due Process Clause of the 14th Amendment, criminal convictions may be had only upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which a defendant is charged. *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991). Accordingly, when a court improperly defines reasonable doubt in its jury instructions, due process is not achieved. *Id.* See, *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990); *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

In *Cage*, the U.S. Supreme Court held that an instruction which at one point instructed that in order to convict, guilt must be established beyond a reasonable doubt, but which equated a reasonable doubt with a " 'grave uncertainty' " and an " 'actual substantial doubt' " and required a " 'moral certainty' " that the defendant was guilty, suggested a higher degree of doubt than required under the reasonable doubt standard permitted by the Due Process Clause. 498 U.S. at 41. 329.

Following that holding, we, in *State v. Morley, supra*, approved an instruction reading:

> "'**Reasonable doubt**' is such a doubt as would cause a reasonable and prudent man, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond reasonable doubt and yet be fully aware that possibly you may be mistaken. The jury may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an actual and substantial doubt reasonably arising from the

evidence, from the facts and circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture."

*Id.* at 154-55, 474 N.W.2d at 669-70. We reasoned that this definition merely advised that "a reasonable doubt is such as would cause a person 'to pause and hesitate' when considering one of the 'graver and more important transactions of life,' " and required jurors to "vote for acquittal unless convinced to a moral certainty that no reasonable doubt exists." *Id.* at 155, 474 N.W.2d at 670.

The questioned instruction in this case does not attempt to compare reasonable doubt to actual or substantial doubt, nor does it complicate the definition of reasonable doubt by referring to moral certainty, as did the instruction in *Cage*. Thus, the questioned instruction avoids the deficiencies which caused the U.S. Supreme Court to reject the *Cage* definition of reasonable doubt. Indeed, the questioned instruction concisely and clearly defines reasonable doubt, requiring the jury to carefully and impartially consider all the evidence, and instructing that if the evidence is so convincing that one would rely and act upon it in important matters, the proof is adequate to convict, notwithstanding that the matter is not free of all possible doubt. The questioned instruction thus accurately defines the requisite standard of proof without minimizing the due process rights of Garza. That being so, we need not concern ourselves with the adequacy of Garza's proposed instruction on the issue.

### 5. PROSECUTOR'S CONDUCT

In connection with the fifth, and last, summarized assignment of error, Garza contends that certain of the prosecutor's statements during closing arguments require the granting of a new trial.

At least one difficulty with this contention is that we are not directed to, nor do we find, any objection in the bill of exceptions to the allegedly improper argument; neither are we directed to, nor do we find, any motion for a mistrial based

upon an improper argument by the prosecutor. An objection to the prosecutor's argument made after the jury has been instructed and has retired is untimely and for that reason will not be reviewed on appeal. *State v. Greeno*, 230 Neb. 568, 432 N.W.2d 547 (1988). See, also, *Harmon Cable Communications v. Scope Cable Television*, 237 Neb. 871, 468 N.W.2d 350 (1991); *State v. Keithley*, 227 Neb. 402, 418 N.W.2d 212 (1988); *State v. Baker*, 201 Neb. 579, 270 N.W.2d 922 (1978); *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985); *Lemmon v. State*, 173 Neb. 387, 113 N.W.2d 525 (1962). As Garza's improper argument claim was raised for the first time in his motion for a new trial, long after the jury had been instructed and had retired, the claim cannot be considered.

## IV. JUDGMENT

There being no merit to the summarized assignments of error, we, as first stated in part I, affirm the judgment of the district court.

AFFIRMED.